UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES RAY SMITH,

              Petitioner,          Case No. 17-CV-13614
                                     HONORABLE GEORGE CARAM STEEH
v.                                UNITED STATES DISTRICT JUDGE

RANDEE REWERTS,[1]

              Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1), GRANTING PETITIONER PERMISSION TO FILE AN EXHIBIT IN THE TRADITIONAL MANNER, AND DENYING PETITIONER'S MOTION FOR PRODUCTION OF DOCUMENTS (Doc. 6) AND FOR ORAL ARGUMENT (Doc. 13)

Petitioner, Charles Ray Smith, filed a petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254, challenging his convictions for first-

degree murder, Mich. Comp. Laws § 750.316, two counts of assault with

intent to rob while armed, Mich. Comp. Laws § 750.89, one count of first-

degree criminal sexual conduct, Mich. Comp. Laws § 750.520b, one count

_____

[1]The only proper respondent in a habeas case is the habeas petitioner's custodian, which in the case of an incarcerated habeas petitioner would be the warden of the facility where the petitioner is incarcerated. *See Edwards Johns,* 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006); *see also* Rule 2(a), 28 foll. U.S.C. § 2254.  The Court substitutes Warden Randee Rewerts, Petitioner's current warden, in the caption in place of Shane Jackson.

of conspiracy to commit armed robbery, Mich. Comp. Laws §§ 750.157a and 750.529, one count of first-degree home invasion, Mich. Comp. Laws § 750.110a(2), and two counts of unlawful imprisonment, Mich. Comp. Laws § 750.349b.  Although Petitioner filed his petition *pro se*, counsel then filed an appearance on his behalf and filed a reply brief in support of his petition. Petitioner is currently serving a life sentence for each of his murder convictions, sentences of 354 to 1,200 months for his assault, criminal sexual conduct, and conspiracy convictions, a sentence of 162 to 360 months for his home invasion conviction, and sentences of 112 to 270 months for his unlawful imprisonment convictions, with the conspiracy and home invasion sentences running concurrent with each other and consecutive to all the other sentences, which also run concurrent with each other.  For the reasons set forth below, the Court shall DENY the petition for writ of habeas corpus.

## I. Background

Petitioner was convicted of the above offenses following a jury trial in the Oakland County Circuit Court, in which he was tried jointly, but with separate juries, with his two co-defendants.  Petitioner's conviction was affirmed on appeal.  *People v. Smith*, No. 288595, 2010 WL 2696678

(Mich. Ct. App. July 8, 2010), *lv. den.*, 488 Mich. 1039 (2011). Petitioner's

post-conviction motion for relief from judgment was also denied after

several evidentiary hearings. (Doc. 8-44, 8-45). The Michigan Court of

Appeals denied Petitioner's post-conviction appeal in a form order, *People*

*v. Smith,* No. 331547 (Mich. Ct. App. July 25, 2016), and the Michigan

Supreme Court denied his post-conviction appeal in a form order. *People*

*v. Smith,* 501 Mich. 907 (2017).

## A.    Facts Elicited at Trial

### 1.    The Home Invasion and Rape

Just after midnight on June 5, 2007, Marquisha Snell was in the

bedroom of the Pontiac home of Cleveland Brown, her boyfriend and the

father of her child, when she heard someone break into the home, threaten

her boyfriend, and demand that he turn over drugs. (Doc. 8-11 at PgID

1328-31). A man, who Snell later identified as co-defendant Jonathan

Phlegm, found Snell in the bedroom and tied her hands behind her back.

*Id.* at PgID 1333-35, 1420, 1425. A man who Snell later identified as co-

defendant, Steven Bard, walked into the bedroom carrying a silver gun and

asked Snell about the drugs. *Id.* at PgID 1336-38, 1368. Snell saw

Phlegm and Bard's faces. *Id.* at PgID 1386, 1420, 1425, 1487-89. The

men forced a pillow over Snell's head. *Id.* at PgID 1351, 1483-84. A short while later, Maurice Threlkeld, who lived with Brown, returned home and was assaulted by the intruders. *Id.* at PgID 1340-42. Then, Snell briefly saw the outline of a third man, who she could tell was black, enter the bedroom where she was tied up. *Id.* at PgID 1344-45, 1493. The third man turned off the lights and touched Snell's buttocks while the other men ransacked the house. *Id.* at PgID 1347. The other men then came into the bedroom. *Id.* at PgID 1348. The unidentified man pulled off Snell's pants and underwear. *Id.* at PgID 1348. Over Snell's repeated protests, the man penetrated Snell with his finger and with his penis. *Id.* at 1349-50.

At one point, the unidentified man grabbed her by the neck and put a pillow over her head. *Id.* at PgID 1351. The man said, "Be quiet Bitch or I'll kill you." *Id.* at PgID 1351-52. One of the men in the room said, "You're just going to do her raw?" *Id.* at PgID 1352. The assailant responded, "No, I do a condom." *Id.* at PgID 1352. The assailant told Snell that he would "be done in a second," and then ejaculated. *Id.* at PgID 1355. After the man finished raping Snell, he said, "Baby Girl, it wasn't meant to be like this. I didn't know his baby's mama was going to be here." *Id.* at PgID 1356. He added, "You're going to need a real man after tonight." *Id.* at

PgID 1356.  Snell testified that she had not had any sex for at least four days before the rape because she was menstruating during that time.  *Id.* at PgID 1386-87, 1460.  Snell also testified that she did not know the Petitioner and had never had consensual sex with him.  *Id.* at PgID 1387, 1460-61, 1493, 1495.

The men then took Brown and Threlkeld out the back door and drove away.  *Id.* at PgID 1369-70.  Snell never saw Brown or Threlkeld again.  *Id.* at PgID 1388.  After the men left, Snell freed herself, dressed, and ran through the neighborhood knocking on doors for help, eventually arriving at the home of her mother's friend, who helped her to call the police.  *Id.* at PgID 1373-75.  Snell went to the Pontiac police station and spoke to Detective Donald Gracey.  (Doc. 8-11 at PgID 1380; 8-10 at PgID 1145, 1157-58).

### 2.    Police Investigation

The police went to the scene to investigate.  (Doc. 8-10 at PgID 1129, Doc. 8-15 at PgID 2317-18).  They observed that the front door had been forced open and the house ransacked.  (Doc. 8-10 at PgID 1133-34; Doc. 8-15 at PgID 2319-20).  The police found a used condom on the bed, collected it, and placed it into evidence.  (Doc. 8-10 at PgID 1138, 1150;

Doc. 8-15 at PgID 2321).   Specifically, evidence technician, Veneta Friend, wore gloves when she picked up the condom with tongs and placed it in a collection bag which she sealed and then delivered to the Michigan State Police Lab.  (Doc. 8-16 at PgID 2382, 2386-87, 2389).

### 3.    Sexual Assault Examination

The police took Snell to a sexual assault shelter.  (Doc. 8-10 at PgID 1146, Doc. 8-11 at PgID 1381, Doc. 8-12 at PgID 1674-75).  Gayle Wint, a registered nurse, began an examination at about 5:00 a.m. on June 5, 2007.  (Doc. 8-12 at PgID 1682-86).  Snell told Wint that she had not had any consensual sexual contact within the prior 96-hours.  *Id.* at PgID 1689-90.  Snell stated that the rapist had used a condom and ejaculated inside her.  *Id.* at PgID 1690.  Wint used a rape kit and collected samples from Snell's body for later analysis.  *Id.* at PgID 1697-1702).  During her examination, she observed injuries to Snell's vagina that were consistent with sexual assault.  *Id.* at PgID 1691.  Wint also observed bright red bleeding coming from the vaginal oriface and not from the cervix, and thus was consistent with sexual assault, and would not have come from a menstrual cycle.  *Id.* at PgID 1695.  The examination ended at 7:50 a.m. *Id.* at PgID 1734.  The rape kit was turned over to the Pontiac Police

Department where it was placed in evidence.  (Doc. 8-12 at PgID 1678, Doc. 8-13 at PgID 1800-02).

### 4.    NWO Meeting and Events of June 6, 2007

Johnny Hodges testified that members of the gang NWO met on the night of June 5, 2007 to seek out members of a rival gang known as the A-Team as it was believed they had kidnapped co-defendant Bard's little brother.  (Doc. 8-15 at PgID 2175-78).  Hodges further testified that Petitioner was present at that planning meeting.  *Id.* at PgID 2179.  Hodges testified that he had seen the defendant and co-defendant Bard together in Pontiac about six times.  *Id.* at PgID 2168.  Just after midnight on June 6, 2007, the police apprehended co-defendant Phlegm and Andre Osborne.  (Doc. 8-13 at PgID 1810-16, 1883-85).  Later that morning, Petitioner and co-defendant Bard went to Hodges' house to hide out.  (Doc. 8-15 at PgID 2183, 2241).  Both were armed.  *Id.* at PgID 2184.  At 4:30 p.m. on June 6, 2007, the police discovered the dead bodies of Brown and Threlkeld in Brown's Suburban parked on the service drive of I-75 in Detroit.  (Doc. 8-10 at PgID 1176, Doc. 8-12 at PgID 1551, Doc. 8-13 at PgID 1941).  Their hands were bound behind their backs and they had been shot.  (Doc. 8-10 at PgID 1186, 1189, 1194-95).

### 5. Corporeal and Photographic Lineup

On June 7, 2007, Snell identified co-defendant Phlegm at a corporeal lineup at the police station. (Doc. 8-11 at PgID 1383). She also identified co-defendant Bard in a photographic lineup. (Doc. 8-11 at PgID 1384, Doc. 8-12 at PgID 1556).

### 6. Forensic Scientists' Analysis

Two forensic scientists used data from the rape kit and the condom for DNA analysis. The first, Melinda Jackson, from the Michigan State Police Crime Laboratory, and expert in biology (Doc. 8-16 at PgID 2398), examined the rape kit specimens gathered from Snell. *Id.* at PgID 2400-02. Jackson detected the presence of seminal fluid in the anal, cervical, and vaginal swabs. *Id.* at PgID 2403-04, 2410, 2420. Jackson also received the condom gathered from the bed where the rape took place. (Doc. 8-15 at PgID 2321, Doc. 8-16 at PgID 2405). She swabbed both the inside and the outside of the condom. (Doc. 8-16 at PgID 2405-06, 2421). Jackson, after analyzing the sperm cells from Snell's vaginal sample, estimated that the sexual intercourse had to have taken place 12 hours or less before the sperm sample was collected. *Id.* at PgID 2413, 2433. However, when pressed on cross-examination by trial counsel, stated it

was possible that the semen was from 24-hours before the collection of the sample.  *Id.* at PgID 2425.

Lynne Helton, a DNA expert who worked for the Michigan State Police Crime Laboratory, *id.* at PgID 2445, received a number of items that had been processed by Jackson for further evaluation.  *Id.* at PgID 2461. She had DNA samples from the co-defendants Bard and Phlegm, as well as Hodges, Osborne, Brown, and Threlkeld, and determined that the DNA on Snell's vaginal swab and on the condom did not match the DNA samples of any of those men.  *Id.* at PgID 2463-65, 2473.  Helton then placed the DNA profile gathered from Snell's vaginal swipe on the national DNA database, and it came back with a match to the Petitioner.  *Id.* at PgID 2466-68).  Helton then obtained a new DNA sample from the Petitioner and determined that it matched the DNA sample from Snell's vaginal swab.  *Id.* at PgID 2468-72.  Helton testified that only one individual in 16.2 quadrillion African-Americans would have the same DNA profile as Petitioner.  *Id.* at PgID 2471-72.  Only Petitioner and Snell's DNA was detected on the vaginal swab.  (Doc. 8-16 at PgId 2491, Doc. 8-17 at PgID 2507, 2512).

Helton testified that the sperm cells found in the samples were probably from sexual intercourse that took place 12 hours or less from

when the samples were collected, but when pressed by defense counsel on cross-examination, admitted that it was possible that they were from 18-hours before. (Doc. 8-16 at PgID 2475, 2477, 2483, Doc. 8-17 at PgID 2508-09, 2514-15). On the outside and inside of the condom, Helton detected the DNA of Snell, the Petitioner, and one unidentified person who could have been male or female. (Doc. 8-16 at PgID 2472-73, 2487-93, Doc. 8-17 at PgID 2505-06, 2511, 2513). Helton testified that she has conducted other examinations where there are multiple individuals detected on a single condom, and sometimes this is explained by the male using the condom with more than one woman, which is not uncommon. (Doc. 8-17 at PgID 2511-12). She testified that the incident of a man reusing a condom is "absolutely a scenario. That is not uncommon." *Id.*

## B.    Procedural History

Following his conviction and sentence of life imprisonment, Petitioner filed a claim of appeal in the Michigan Court of Appeals that raised the following claims: (1) the trial court committed plain error in failing to instruct the jury that it should view the testimony of Hodges with caution as he was an accomplice after the fact to Petitioner's alleged crimes; (2) he was denied effective assistance of counsel because his trial counsel failed to

request a cautionary instruction on the unreliability of accomplice testimony; and (3) he was denied effective assistance of counsel because trial counsel failed to move for a mistrial when the officer in charge revealed that Hodges had passed certain tests that cleared him from prosecution. Petitioner's conviction was affirmed on appeal. *People v. Smith*, No. 288595, 2010 WL 2696678 (Mich. Ct. App. July 8, 2010), *lv. denied*, 488 Mich. 1039 (2011).

Petitioner then filed an original and amended post-conviction motion for relief from judgment with the trial court raising the same issues presented in the habeas petition now before the court. Several hearings were conducted on the motion, after which the judge denied the motion on the record on August 26, 2015, and in a written order. (Doc. 8-44; 8-45).

In part, Petitioner argued ineffective assistance of trial and appellate counsel because his attorney failed to present certain witnesses who allegedly would have testified that he knew the rape victim. Petitioner also claimed that his attorney failed to sufficiently investigate those witnesses pretrial so that his attorney could have made the decision not to present those witnesses because of his concerns about their veracity prior to his opening statement where he suggested that such witnesses would testify.

The trial court conducted an evidentiary hearing and heard three days of testimony from the Petitioner, his trial counsel, his appellate counsel, and Detective Bil Drew.  Petitioner also offered the testimony of his best friend, Donald Jackson, and his aunt, Jacqueline Cooper, who allegedly would have testified that Petitioner knew the rape victim.  The trial court denied the motion for relief from judgment in a detailed oral ruling from the bench as well as in a summary written order.  The court summarizes the testimony and evidence presented during those evidentiary hearings below.  In deciding the motion for relief from judgment, the trial court made several credibility determinations regarding what advice defense counsel had given to the Petitioner during his trial, and what agreements they had reached regarding trial strategy.

**C.   Evidentiary Hearings re Petitioner's Motion for Relief from Judgment**

**1.   Trial Counsel's Investigation**

Because Petitioner complains that his attorney did not properly investigate his case pre-trial, the court summarizes here the steps his attorney took in representing him.  Petitioner's trial counsel, Douglas Oliver, met with Petitioner nine times prior to trial.  (Doc. 8-33 at PgID 3410).  He contacted some of the witnesses, including Petitioner's fiancé, Tara

Ledgerwood, and best friend, Donald Jackson, (Doc. 8-31 at PgID 3352),

who had been identified by Petitioner prior to trial by telephone, although

his conversations with the witnesses left him with some questions about

their veracity. *Id.* at PgID 3409-11, 3444. He retained a DNA expert who

confirmed that the Michigan State Police forensic scientists had done a

proper job. *Id.* at PgID 3412. He also reviewed the preliminary

examinations of the co-defendants. *Id.* at PgID 3413. Prior to trial, he

developed a trial strategy that the Petitioner knew the victim and had

consensual sex with her 48-hours prior to the rape. He presented this

theory to the jury in his opening statement, where he stated:

> First, I believe that the evidence will show that prior
> to this incident, the one that was described on June
> 5th, 2007, my client knew Marquisha Snell. He had
> known her for two months prior. And said they had
> a consensual, sexual relationship. The evidence will
> show that, two days, forty-eight (48) hours prior, my
> client and Ms. Snell had a sexual encounter in
> Detroit.
>                                  . . .
>
> 'There's also the DNA types detected from' and I'm
> going to use the inside condom swabs, 'Phenyl
> fraction are consistent with a mixture of DNA from
> multiple donors, at least one of which is male.' Let
> me say that again. 'Multiple donors of which at least
> one is male.'

(Doc. 8-8, PgID 820, 823). Trial counsel did not promise that any particular

witnesses would testify nor did he promise that the Petitioner himself would testify.

## 2.    Trial Counsel's Strategy

At the hearing regarding Petitioner's motion for relief from judgment, Defense counsel testified that his trial strategy evolved during the trial, and that Petitioner agreed with the changed strategy.  (Doc. 8-33 at PgID 3420).  Oliver testified that he determined he could not use Petitioner's witnesses after meeting with them in the hallways of the courthouse during trial because he believed they were not being truthful, and he did not want to suborn perjury.  *Id.* at PgID 3420.  He told Petitioner that he could not use them for that reason, and Petitioner agreed.  *Id.* at PgID 3420-21.  At the evidentiary hearing, Petitioner denied that he agreed not to use the witnesses because of their lack of veracity.  Instead, Petitioner claims that he thought they did not testify because they were not available at the time the prosecution rested.  *Id.* at PgID 3448.  However, the trial court rejected Petitioner's version of events and gave credence to his attorney's testimony that Petitioner had agreed with his decision not to use his witnesses because he seriously doubted their truthfulness.  (Doc. 8-44 at PgID 3700-01).

Defense trial counsel elicited testimony during the trial from forensic scientist Helton that the semen could have been deposited as much as 18-hours prior to collection, and that the DNA of a third unidentified person was on the used condom.  During his closing argument, defense counsel referenced his statement that the Petitioner and the victim had consensual rape 48-hours before the rape, (Doc. 8-19 at 2841), but argued that the scientific evidence presented at trial showed that Petitioner and the victim had consensual sex 18-hours prior to the rape, and that the third donor found on the condom belonged to the rapist.  *Id.* at PgID 2828, 2834, 2842, 2845.

### 3.    Appellate Counsel

In his habeas petition, Petitioner argued that appellate counsel Susan Meinberg was deficient because she did not raise the issue that defense counsel failed to call or properly investigate his witnesses, did not investigate whether these witnesses were lying herself, and did not locate the recording between the rape victim and her ex-boyfriend, Leatrice Williams, before filing her appeal.  At the hearing regarding Petitioner's motion for relief from judgment, Meinberg testified that Petitioner had waived any argument that those witnesses should have testified at trial

because he agreed with trial counsel's revised strategy to focus on the multiple donors on the condom. (Doc. 8-34 at PgID 3463). Meinberg further testified that she spoke with trial counsel, Oliver, who told her that he did not call those witnesses because evidence existed that the Petitioner was in jail talking back and forth about creating witnesses. *Id.* at PgID 3463, 3466. Meinberg said that Oliver's statement that Petitioner was attempting to create witnesses was confirmed in the government's sentencing memorandum. *Id.* at PgID 3463.

Meinberg also testified that Oliver told her one of the witnesses "backed off" who he saw in the car - allegedly a reference to Cornelius Perry who Petitioner claimed would testify was in the house when the Petitioner was having sex with the victim in his car and allegedly saw them. *Id.* at PgID 3462, 3466, 3475-76. Meinberg testified that Petitioner agreed with her decision not to raise the issue that his counsel was allegedly deficient for failing to call certain witnesses. *Id.* at PgID 3469. Also, a written letter from Petitioner substantiated Meinberg's recollection that Petitioner agreed not to proceed with the argument that his counsel was deficient for failing to call certain witnesses. Specifically, she read the letter into testimony: "it's his letter dated July 1st, 2009. Mr. Smith wrote that

quote, regarding your reasons as to my attorney's strategic decisions concerning the claim of my defense witnesses, which I will accept at this time." *Id.* at PgID 3469.

Meinberg also testified that she reviewed the transcript between the victim and Leatrice Williams as to the rumor that Andre Osborne was the rapist, which would not change her decision on what to argue in her ineffective assistance of counsel claim because Osborne was excluded as a donor of the DNA. Thus, Meinberg concluded that would be no prejudice even if the government's had failed to turn over the transcript of that phone call. (Doc. 8-34 at PgID 3471-73). The record reflects, however, that trial counsel had and used the audiorecording during his cross-examination of Snell. (Doc. 8-11 at PgID 1484-85).

### 4. Donald Jackson

Although Petitioner claimed there were multiple defense witnesses who would have testified on his behalf, he produced only two witnesses at the evidentiary hearing regarding his motion for relief from judgment: his best friend, Donald Jackson, and his aunt, Jacqueline Cooper. Their testimony is summarized here. Jackson testified that he saw the Petitioner with a woman by the name of Fat-Fat (the victim's nickname) at a

nightclub, the State Theater, in Detroit in early May. (Doc. 8-31 at PgID 3350-51). Jackson testified that Petitioner introduced Fat-Fat to her as a woman he was dating. *Id.* at PgID 3350. Jackson testified that he spoke to trial counsel, Oliver, before trial on the telephone and in the hallway during the trial. *Id.* at PgID 3352-53. He said he was prepared to testify that he had seen Petitioner at the club with Fat-Fat. *Id.* at PgID 3352. Jackson also admitted to e-mails prior to the evidentiary hearing between him and the Petitioner in which Petitioner told him it was time to perform, reminding him that his calls and emails were being monitored, and stating that he does not just ask anyone to "bend the rules" for him. *Id.* at PgID 3360-61. Jackson also testified that he did not know whether the female he met at the nightclub in 2007 was the same female who testified at trial to being sexually assaulted. *Id.* at PgID 3365.

At the evidentiary hearing, Jackson identified Snell, or the woman he knew as "Fat Fat," in a photo lineup presented by petitioner's post-conviction counsel, although he admitted he was unsure if it was the victim. (Doc. 8-31, Page ID 3353-3354, 3358). The government objected to the photo array because it was unclear how the array was composed and whether the victim was even in the array. *Id.* at PgID 3350. Post-

conviction counsel admitted he had shown the photo array to Jackson before the evidentiary hearing. *Id.* at PgID 3353. At the end of Jackson's testimony, the trial judge asked, "Do you know whether the female you met at the nightclub in 2007 was the same female who testified in trial to being sexually assaulted?" Jackson testified, "No." *Id.* at PgID 3365.

At the hearing held on August 26, 2015, the trial court noted its "disfavor with this witness' [Jackson's] credibility, his demeanor on the stand just left the court with a little bit of a sour taste in its mouth. A review of the e-mail exchanges between Jackson and [Petitioner] from prison only enhanced that sour taste." (Doc. 8-44 at PgId 3699-700). The court further found Jackson "foremost motivated by a desire to help [Petitioner] than foremost beholden to his oath." *Id.* at PgID 3700. The trial court also found that there would have been no benefit to putting Jackson on the stand as his testimony was equivocal as to whether he was sure he had seen the rape victim before. *Id.* at PgID 3700.

### 5. Jacqueline Cooper

Jacqueline Cooper testified that Petitioner introduced her to the rape victim on one occasion. (Doc. 8-31 at PgID 3368). Cooper testified that the victim was in the driver's seat of a truck when she saw her. *Id.* at PgID

3376.  She testified that she spoke to trial counsel, Oliver, at trial but not before.  *Id.* at PgID 3370.  Post-conviction counsel also showed her a photo array of six photos, two of which were the rape victim.  *Id.* at PgID 3372-73.  The pictures of the rape victim were visibly marked with "Xs" in ink.  *Id.* at PgID 3373.  Also, counsel had shown Cooper the photos before the hearing.  *Id.* at PgID 3372.  The trial judge found that "[h]er testimony on Direct when lined up with her testimony on Cross, shed[s] some light of incredibility."  *Id.* at PgID 3700.  He further found that Petitioner waived calling Cooper as a witness, and accepted as true Oliver's testimony that he told Petitioner he could not call Cooper because of her lack of veracity, and that Petitioner agreed.  (Doc. 8-44 at PgID 3700-01).

### 6.    Detective Bil Drew

Detective Sergeant Bil Drew of the Michigan State Police took the victim's written statement following the rape.  (Doc. 8-31 at PgID 3384).  In his written statement, he recorded that Snell told him she saw the rapist briefly and was able to determine he was dark skinned, with a mustache, and wore a baseball hat.  *Id.* at PgID 3387.  She also testified that he turned off the light and that a pillow was over her head during the rape.  *Id.* at PgID 3390-91.

**D.  Petitioner's Habeas Claims**

Petitioner seeks a writ of habeas corpus on the following grounds:

I. The Petitioner was denied his due process right to a fair trial by the ineffective assistance of counsel of both trial and appellate counsel.

II. The Petitioner was denied his due process rights to a fair trial under *Brady v. Maryland* when the State intentionally suppressed material exculpatory evidence.

III. The Petitioner was denied his due process right to a fair trial when the State presented false testimony and failed to correct testimony during Petitioner's trial.

IV. The Petitioner was denied his due process right to a fair trial when the State failed to preserve exculpatory DNA evidence under the Fourteenth Amendment.

V. The Petitioner has provided the state court with new evidence and witnesses supporting that he is actually innocent for the crimes for which he is convicted.

## II.  Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), imposes the following standard of

review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

## III.  Discussion

## A.  Ineffective Assistance of Trial and Appellate Counsel

The court first considers whether Petitioner has demonstrated ineffective assistance of trial and appellate counsel.  Petitioner argues

ineffective assistance of counsel for the following reasons: (1) failure to call certain witnesses or perform an adequate pretrial investigation; (2) failure to introduce Detective Drew to impeach Snell; and (3) failing to make greater use of a jail house audio-recording between Snell and her ex-boyfriend.  Petitioner has not demonstrated that either his trial or appellate counsel provided deficient representation.  But even if Petitioner demonstrated deficient performance, Petitioner has not shown any prejudice as there has been no showing that had trial counsel performed a fuller investigation prior to trial or appellate counsel raised that issue and others on appeal, the result of the proceeding would have been different. The court considers each sub-claim below.

### 1. Failure to Call Certain Witnesses and Failure to Make Adequate Pre-trial Investigation

In reviewing a claim under the AEDPA's deferential standard of review, this Court must review "the last state court to issue a reasoned opinion on the issue." *Hoffner v. Bradshaw,* 622 F.3d 487, 505 (6th Cir. 2010) (quoting *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005)); *see also Barrientes v. Johnson*, 221 F.3d 741, 779 (5th Cir. 2000) ("When the last state adjudication of the claim is silent or ambiguous, the federal court should look through to the last clear state decision on the matter.")(internal

quotation marks omitted).  Because the Michigan Court of Appeals and the Michigan Supreme Court simply denied petitioner's post-conviction appeal in an unexplained one-sentence order, this Court must "look through" these decisions to the Oakland County Circuit Court's opinion denying his post-conviction motion, the last state court to issue a reasoned opinion, and determine whether that court's adjudication of Petitioner's claims was "contrary to," or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. *See Hamilton v. Jackson,* 416 F. App'x. 501, 505 (6th Cir. 2011).  The court finds that it was not.

The court first summarizes the standard of law analysis required for ineffective assistance of counsel claims.  To show that he or she was denied the effective assistance of counsel under federal constitutional standards, a petitioner must satisfy a two prong test.  First, the petitioner must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In so doing, the petitioner must overcome a strong presumption that counsel's behavior lies within the wide range of

reasonable professional assistance. *Id.* In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Id.* at 689. Second, the petitioner must show that such performance prejudiced his or her defense. *Id.* To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. When analyzing a claim of ineffective assistance of counsel, the court "must indulge the strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Cullen v. Pinholster*, 563 U.S.170, 196 (2011) (citation omitted). Surmounting this "'high bar is never an easy task,'" and a court must apply this standard "'with scrupulous care.'" *Id.* at 197. (citation omitted).

The court now analyzes the facts presented here under *Strickland* and its progeny. Petitioner, through his current counsel, raised several ineffective assistance of trial counsel claims in his post-conviction motion for relief from judgment. An evidentiary hearing was conducted on Petitioner's claims.

Petitioner claimed he had several witnesses who would testify that he

and Snell had a prior consensual sexual relationship, which he argued could have been presented to offer an innocent explanation for the presence of his DNA in the victim's vagina.  Of those witnesses, only two testified on his behalf at the evidentiary hearing: Jackson and Cooper.  The trial judge found these witnesses to be biased and incredible.  In a habeas case, there is a statutory presumption that the state court's factual findings are correct, 28 U.S.C. § 2254(e)(1), and the presumption particularly applies to credibility determinations which are entitled to "special deference."  *Patton v. Yount*, 467 U.S. 1025, 1038 (1984); *Brown v. Davis*, 752 F.2d 1142, 1147 (6th Cir. 1985).

While Respondent's point is well taken that it is not appropriate for the state court to assess the credibility of a potential witness to determine if his or her testimony would have changed the outcome of the proceeding, "in the context of a *Strickland* evidentiary hearing, it is for the judge to evaluate the credibility of the criminal defendant and the former defense counsel in deciding what advice counsel had in fact given to the defendant during his trial, and such findings are entitled to the Section 2254(e)(1) presumption."  *Ramonez v. Berghuis*, 490 F.3d 482, 490 (6th Cir. 2007) (citation omitted).  Here, the state judge made credibility determinations

regarding who to believe: trial counsel who testified that he told Petitioner that he would not call his witnesses because of his concerns regarding their veracity, and further testified that Petitioner agreed with the modified trial strategy to rely on the scientific evidence alone, or Petitioner, who denied such acquiescence. The state judge determined trial counsel was credible and discounted Petitioner's testimony to the contrary as incredible. (Doc. 8-44 at PgID 3700-01).

In weighing the conflicting testimony, the trial judge noted that these witnesses would not have helped his defense in any meaningful way because of their lack of veracity. Although this observation does not merit Section 2254(e)(1) deference, it does bolster defense counsel's credibility on the question of what advice did he give to his client during the trial. Further bolstering trial counsel's credibility regarding what advice he gave Petitioner during the trial, was appellate counsel's testimony that Oliver told her that he made the strategic decision not to use those witnesses because there was evidence that Petitioner was trying to create or shade their testimony. (Doc. 8-34 at PgID 3463). Trial counsel testified that Petitioner agreed not to use these witnesses because of their untruthfulness. (Doc. 8-33 at PgID 3420-21). Specifically, he testified, "And as a result of our

discussion, he agreed, and we together decided not to call those witnesses." *Id.* at PgID 3421.  The trial judge found trial counsel's testimony to be credible, and rejected Petitioner's testimony to the contrary as incredible.  (Doc. 8-44 at PgID 3700-01).  The trial judge also concluded that "there was no error in not calling these witnesses, and it is obvious, of course, things can change during a trial and after opening statements." (Doc. 8-44, PgID 3704).  Based on the above, Petitioner has not shown that his counsel was deficient for failing to call Jackson and Cooper to testify at trial.

The court next considers Petitioner's argument that his trial counsel's failure to investigate these witnesses pretrial was deficient performance because he promised such testimony in his opening statement, and his failure to fulfill that promise was prejudicial.  The breach of an important promise in an opening statement, such as the promise that a defendant will testify, may sometimes amount to deficient performance.  *See English v. Romanowski,* 602 F.3d 714, 729 (6th Cir. 2010); *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988); *Thompson v. Rapelje*, No. 12-10781, 2015 WL 1345250, at *14 (E.D. Mich. Mar. 25, 2015), *aff'd*, 839 F.3d 481 (6th Cir. 2016).  However, "[a]n attorney's failure to fulfill promises made in opening

statement is not often a successful basis for an ineffective assistance claim." *Hampton v. Leibach*, 290 F. Supp. 2d 905, 928 (N.D. Ill. 2001), *aff'd*, 347 F.3d 219 (7th Cir. 2003). This is because "[t]he decision to change strategy during trial is often forced upon defense counsel by the vagaries of the courtroom arena." 290 F. Supp. 2d at 928. Such is the case here where the scientific evidence presented at trial presented a better trial strategy for the Petitioner, namely that the rape victim and Petitioner had consensual sex 12 to 18 hours before the rape.

First, and perhaps most importantly, Petitioner never promised that Jackson or Cooper would testify by name. He only argued more generally that the "evidence will show" that Petitioner knew the rape victim, had a consensual, sexual relationship, and had a sexual encounter with the rape victim 48-hours prior to the rape. (Doc. 8-8 at PgID 820). At trial, counsel modified his trial strategy to rely solely on the DNA evidence as a defense. Petitioner's change of trial strategy was a sound one when he was able to elicit from cross-examination of Helton that the DNA collected from the rape victim could have been from as much as 18-hours before the sexual assault examination and that there was the unidentified DNA of a third-person on the used condom. Trial counsel pointed to the unidentified third

person as the actual rapist and participant in the murders. The court does not find counsel's change in trial strategy to be deficient. And even if trial counsel had determined that Jackson and Cooper were untruthful prior to his opening statement, and thus did not promise evidence of a consensual sexual relationship in his opening, there is not a reasonable likelihood that this would have resulted in a different outcome. That evidence would only be useful as impeachment evidence of the rape victim that she did not know the Petitioner, and would not overcome the powerful DNA evidence from the rape victim's vagina and from the condom collected at the crime scene. It may also have been sound trial strategy to claim in the opening statement a prior consensual sexual relationship, based on the use of a condom and the presence of the Petitioner's DNA, even if trial counsel had found the witnesses to be incredible in pretrial interviews.

The trial judge's decision that counsel was not ineffective was consistent with the strictures of *Strickland* as Petitioner has failed under both prongs, by failing to show deficient performance or actual prejudice. Petitioner relies on *English v. Romanowski, supra*, to support his claim that his counsel was deficient for failing to present witnesses and to properly investigate his case. This case is distinguishable from *English v.*

*Romanowski*, *supra*, in several significant respects.  In *English*, the

defendant was charged with assault with intent to murder and carrying a

concealed weapon.  602 F.3d at 717.  The prosecution's case was not

strong and relied solely on the testimony of biased witnesses.  *Id.* at 730.

During his opening statement, defense counsel promised that the

defendant's now wife would testify.  *Id.* at 719.  Her proposed testimony

was that the victim was trying to hit her when the defendant attacked her

thus, supporting a self-defense theory.  *Id.*

Defense counsel later decided not to use her at trial, but never

discussed this decision with his client, nor did his client consent to the

changed trial strategy.  *Id.* at 721.  The Sixth Circuit held that defense

counsel's decision not to call the defendant's now wife as a witness was

not deficient performance and was a reasonable trial strategy because he

had several good reasons not to call her: (1) she was biased because of

her failed relationship with the defendant and her romantic relationship with

the victim, and (2) she had threatened another witness to change his story.

*Id.* at 726.  But the Sixth Circuit held her counsel was deficient for failing to

investigate the witness before promising her testimony in his opening

statement.  This deficiency was glaring because it would have been a

simple matter to interview witnesses to see if the witness tampering allegations were true, and counsel did not even review the preliminary hearing transcript which would have revealed the very concerns on which he based his decision. *Id.* at 728-29. Further exacerbating the situation, the trial court admitted evidence regarding her witness tampering and alleged false evidence planting which would have been inadmissible had she not been identified by defense counsel as a potential witness. *Id.* at 730. Finally, the Sixth Circuit stressed that the Petitioner's guilt was not overwhelming. *Id.*

This case is markedly distinguishable. First, here defense counsel never promised a specific witness would testify by name. Second, and perhaps most importantly, defense counsel discussed his revised trial strategy with the Petitioner who agreed not to call any witnesses. His revised trial strategy that the scientific evidence alone would exonerate the Petitioner was reasonable in light of the testimony he was able to elicit from forensic scientists Jackson and Helton, and Petitioner agreed with the revised strategy. In addition, trial counsel's revised trial strategy to focus on the third donor on the condom, and the 18-hour window for the semen deposit, admitted by the forensic scientist, was sound and reasonable. The

revised strategy was stronger than that promised in the opening statement as it was based on the DNA evidence which was the crux of the government's case.  The modified trial strategy also did not contradict the opening statement's claim of a consensual sexual relationship.  Further tempering any alleged prejudice by the failed promise to introduce evidence that Petitioner had consensual sex 48-hours prior to the rape, was trial counsel's reference to that promise in his closing statement and his explanation that he was now relying on the scientific evidence which he argued proved "the deposit of the sperm insider her vagina was sometime between 12 and 18 hours before, which is clearly long before any Home Invasion, any Robbery, or any Rape."  (Doc. 8-19 at PgID 2842).

In addition, this is not a case where counsel performed no investigation.  Unlike the lawyer in *English* who failed even to review the preliminary examinations, in this case, defense counsel did review the co-defendants' preliminary examinations, met with the Petitioner nine times, interviewed some of the witnesses pre-trial, including Jackson, and retained a DNA expert.  In addition, no incriminating evidence that would otherwise be inadmissible was admitted based on counsel's opening statement.  Also, unlike the weak evidence presented by the prosecution in

*English* which relied solely on biased testimony; here, the evidence relies on strong scientific evidence which determined that Petitioner's DNA was found from the victim's vaginal smear as well as from the condom. The forensic scientist testified that the DNA is a very rare profile, and that the DNA that matched Petitioner could only be from one in 16.2 quadrillion people. The rape victim testified that she did not know Petitioner and had never had consensual sex with him. This testimony was consistent with her statement given right after the sexual assault when she told the examining registered nurse that she had not had any sex within 96-hours of the rape.

There was strong physical evidence that Snell had been raped. There was also testimony linking the Petitioner to other gang members and to his co-defendants, and testimony that Petitioner was present at a planning meeting before the crimes took place, and that he hid out with one of his co-defendants after the crimes occurred. Based on these strong proofs, even if trial counsel was deficient in certain respects, there has been no showing of actual prejudice. For these reasons, *English* is wholly distinguishable and cannot form the basis for habeas relief.

In addition, the trial court instructed the jury that the Petitioner was

"not required to prove his innocence or to do anything," (Doc. 8-19 at PgID 2860) which would ameliorate any prejudice as juries presumptively follow the law. *See Rapelje*, 839 F.3d 481, 485 (6th Cir. 2016) (finding no prejudice when trial counsel reneged on promise during opening that defendant would testify when jury instructed not to consider his failure to testify in reaching its verdict) (citing *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009)). In sum, Petitioner has failed to show that his trial counsel was ineffective for his failure to call certain witnesses or to conduct an adequate pre-trial investigation before making certain promises in his opening statement.

### 2. Detective Drew's Testimony

Petitioner also argues that his attorney erred when he did not call Detective Drew to testify that the victim described her rapist in her police statement, which could have been used to impeach Snell's testimony at trial that she did not see her rapist. Petitioner's argument draws too fine a line. In her statement, Snell told Detective Drew that she observed that her rapist was dark complexioned, had some facial hair, and wore a baseball cap before he turned off the light. Her pre-trial statement is not exculpatory as impeachment evidence as the fact that Petitioner could make certain

generic observations about her rapist before he turned off the light is not inconsistent with her trial testimony that she did not see her rapist. At trial she was asked, "Did you get a look at his face?" to which she responded, "I really couldn't see how he looked because he turned off the lights." (Doc. 8-11 at PgID1344). Also, even if her statement could somehow be construed as impeachment evidence, any attack on her credibility would not alter the damning DNA evidence obtained from her vaginal smear taken hours after the rape.

### 3. Telephone Call Between Leatrice Williams and Snell

Petitioner also argues his attorney erred by not using a jail house recording to impeach Snell in which Snell speaks with her ex-boyfriend Leatrice Williams and states she overheard a rumor that she was raped by Andre Osborne, and that she would call and snitch on him. (Doc. 8-33 at PgID 3414, 3417). She did not. Although at the evidentiary hearing trial counsel could not remember if he heard the Leatrice Williams' audiorecording, the trial record reflects that he did as trial counsel questioned Snell about that conversation. (Doc. 8-11 at PgID 1484-85). Petitioner argues that the record reflects that his attorney did not receive the audiorecording. However, after the audiorecording was played for trial

counsel at the evidentiary hearing, which was conducted some six years after the trial, his attorney testified, "I don't remember hearing this tape. But I can't say that this is the first time I've heard it or that I've heard it before and I just don't remember." (Doc. 8-33 at PgID 3417). Also, the recording reflects that Petitioner did not see her rapist and thus, is consistent with her trial testimony. *Id.* Because introduction of audiotape would have been inadmissible hearsay, and would not have assisted his defense, any lack of additional use of the recording does not amount to ineffective assistance of counsel. Finally, any implication that Osborne was the rapist was contradicted by the DNA evidence and would not have been sound trial strategy as a result.

### 4. Appellate Counsel

Petitioner also argues that appellate counsel was ineffective for failing to challenge his trial counsel's failure to call certain witnesses or conduct a full investigation, and for failing to use the audiorecording as impeachment evidence. Because the court finds trial counsel did not err in these ways, appellate counsel was not deficient for not making these arguments either. Petitioner also argues appellate counsel was deficient for failing to conduct a full investigation herself, for calling no witnesses,

pursuing no leads, and failing to remand upon the discovery of withheld evidence. Petitioner's arguments are not supported by the record. Appellate counsel testified that she met with Petitioner in prison, accepted many phone calls, reviewed the trial transcripts, spoke with defense counsel, reviewed the sentencing memorandum, and reviewed Detective Drew's statement. (Doc. 8-34 at PgID 3461, 3463-67). She discussed Petitioner's concern that certain of his proposed witnesses were not called, but determined he had waived the issue and consented to a revised trial strategy. *Id.* at PgID 3463. She also was influenced in her strategy on appeal by her conversation with trial counsel who told her his concern that Petitioner was trying to "create" witnesses. *Id.*

After appellate counsel filed her brief, Petitioner's girlfriend presented her with affidavits from defense witnesses, but she considered them irrelevant based on Petitioner's waiver and trial counsel's statement that Petitioner was trying to "create" witnesses. *Id.* at PgID 3466. She also reviewed the audiorecording after she filed her brief, but did not feel it was exculpatory and thus, did not file a motion in the Court of Appeals to reopen the appeal to add a new issue. *Id.* at PgId 3468. The court does not find that appellate counsel was deficient, or that her performance

prejudiced his defense.

## B.  The *Brady* Claim

Under the rule announced in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), a defendant's due process rights are violated if the government suppresses favorable evidence where the evidence is material to guilt or punishment, irrespective to the good or bad faith of the prosecution. *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Mason v. Mitchell*, 320 F.3d 604, 628 (6th Cir. 2003).  To demonstrate a *Brady* violation, a defendant must demonstrate three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the state must have suppressed the evidence, whether wilfully or inadvertently; and (3) prejudice must have resulted.  *Strickler*, 527 U.S. at 281-82; *O'Hara v. Brigano*, 499 F.3d 492, 502 (6th Cir. 2007).  Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682 (1985).  *Brady's* obligation to disclose applies to exculpatory evidence that is known only to the police, but withheld from the

prosecution. *See Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995); *see also Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009).

There are two subparts to Petitioner's *Brady* claim. He alleges that (1) the government failed to disclose the audiorecording of the telephone call between Snell and Williams; and (2) the prosecution suppressed evidence that Donald Jackson was shown a photographic array on July 31, 2008 by a Detroit police investigator, the day that Petitioner's trial began, which included Snell's photograph**.** The first argument is readily dispensed with as the trial record is clear that Petitioner's counsel received the audiorecording and cross-examined the rape victim about it at trial. The court turns now to Petitioner's second *Brady* argument.

Petitioner claims that the prosecution suppressed evidence that Donald Jackson was shown a photographic array on July 31, 2008 by a Detroit police investigator, the day that Petitioner's trial began, which included Snell's photograph. Jackson identified Snell as possibly being the woman whom Petitioner was dating in the summer of 2007. *See* Jackson's statement, Petitioner's Exhibit A, Doc 1-1, Pg ID 153. Specifically, when he was asked, "Do you recognize any of these young women as being acquaintances of [the Petitioner]?" he responded, "I can't say for sure, but

maybe #2." *Id.* at PgID 151-53. He also stated, "Look[s] like I saw her before but I'm not sure that I met her before." *Id.*

As to the photo array, the state trial judge ruled that even if this evidence was material and suppressed, the suppression was not prejudicial to the defense. (Doc. 8-44, PgID 3711-3716). The evidence would not be particularly helpful given Jackson's credibility problems, and the fact that his identification was equivocal. Also, defense counsel's strategic decision not to call Jackson based on his ethical concerns regarding Jackson's veracity played into the court's determination there was no prejudice. *Id.* at 3715. In order to show prejudice, the evidence must create a reasonable probability of a different result. *Strickler*, 527 U.S. at 280, 282; *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (en banc). Here there is no reasonable probability of a different result, as defense counsel's decision not to call Jackson as a witness was a sound trial strategy where there was evidence that Petitioner was trying to manufacture or "create" Jackson's testimony, which if admitted would not only impeach Jackson but would cast Petitioner himself in a very bad light. Also, Jackson's selection of Snell's photograph from the line-up was weak evidence that the two had a dating relationship as Jackson himself stated

he was "unsure" if that was the right woman. (Doc. 1-1, Ex. A at 623). Moreover, the strong scientific evidence based on the DNA match of Petitioner to the rape victim's vaginal smear and to the condom, combined with the physical evidence of a sexual assault, was overwhelming evidence of Petitioner's guilt which would not be overcome by the evidence of the photo array.

## C.    Hodges' Testimony

Next, Petitioner argues the prosecution used false testimony of Hodges. It is well settled that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). To prevail on such a claim, the defendant must show that (1) the testimony was false, (2) the testimony was material, and (3) the prosecutor knew the testimony was false. *Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir. 2005) (citing *United States v. Hawkins*, 969 F.2d 169, 175 (6th Cir. 1992). Hodges testified that Petitioner associated with the NWO gang, (Doc. 8-15 at PgID 2172), that he had seen the Petitioner with co-defendant Bard about six times, *id.* at PgID 2168, that the Petitioner took part in a meeting

with the co-defendants on the evening of the murders and rape, where they discussed that a rival gang had abducted co-defendant Bard's little brother, and they were going to go "hunt" for the rival gang members. *Id.* at PgID 2175-76, 2179. He also testified that he saw the Petitioner and co-defendant Bard at his parent's house on the morning after the rape. *Id.* at PgID 2183.

Petitioner argues that the prosecution knew that Hodges' testimony was false because he had lied in another criminal case near the same time, and there were several inconsistencies that Hodges made prior to trial in police statements and at trial. Hodges testified in the *Butler* case after he testified in Petitioner's case; specifically in January, 2009 and in Petitioner's case in August, 2008. (Doc. 8-29 at PgID 3300). His false testimony in the *Butler* trial was not discovered until March 15, 2012, when Butler's family received, pursuant to a Freedom of Information Act request, a document stating that Hodges was in prison on the date of the shootings. (Petitioner, Ex. J, Doc. 1-1 at PgID 178). As a result, the government stipulated to a new trial for Butler. *Id.* Hodges' false testimony in the *Butler* trial was unknown at the time of the *Smith* trial as it had not yet happened, and thus, is not evidence of prosecutorial misconduct. The prosecutor's

testimony at the evidentiary hearing that he would probably not use Hodges' testimony if there were a retrial, (Doc. 8-29 at PgID 3334), given the questions about Hodges' veracity that came to light in a later trial, does not mean that the prosecution knew that Hodges would offer false testimony at Petitioner's trial.

In addition, whatever inconsistencies existed between Hodges' trial testimony and pretrial statements to police were probed during cross-examination. Specifically, Hodges testified at trial that Petitioner and co-defendant Bard were at his parent's house on the morning of June 6, 2007, but to Office MacQuarrie, Hodges stated it was Phlegm, Bard, and Dre. But during cross-examination, co-defendant Phlegm's counsel probed Hodges about the inconsistency between Hodges' pretrial statement to the police that Phlegm, Bard and Dre were at his parents' house after the incident and his testimony at trial that Phlegm was not there. (Doc. 8-15 at PgID 2206). Thus, the jury was privy to the alleged inconsistencies and was well informed in making its credibility determinations. Petitioner also argues Hodges' testimony was perjured because he told ATF Special Agent Schimke during an interview that only co-defendant Bard and Chuck (Petitioner's nickname) were present at his parents' house. But at trial,

Hodges testified that co-defendant Bard, Petitioner, and Dre were at his parent's house on the morning of June 6, 2007. (Doc. 8-15 at PgID 2256). The addition of Dre would be inconsistent with his pre-trial testimony, but it is merely that, and is not proof that the government knowingly used perjured testimony.

On his direct appeal, Petitioner also argued that the prosecutor knowingly used Hodges' allegedly perjured testimony at trial. The Court of Appeals held that the issue was not preserved as Petitioner failed to join in codefendant Bard's pretrial motion to exclude Hodges' testimony at trial. *People v. Smith*, No. 288595, 2010 WL 2696678, at *8 (Mich. Ct. App. July 8, 2010). Nevertheless, the Court of Appeals considered the issue on the merits and found that at most, Petitioner showed prior inconsistent statements that could be used for impeachment, and that his credibility was disputed. *Id.* But the Court of Appeals found there was no evidence that the testimony was false or that the prosecution knew that the testimony was false. *Id.* This court reaches the same conclusion: Petitioner has not shown that Hodges' testimony was false or that the prosecution knew it was false. Moreover, defense counsel for Petitioner and co-defendant Phlegm thoroughly cross-examined Hodges, challenged his credibility, and

brought to light the inconsistencies between Hodges' pretrial statements to police and his trial testimony.

**D.      Evidentiary Hearing**

Petitioner argues he is entitled to an evidentiary hearing on the issue of whether the prosecution knowingly used false evidence.  He further argues that an evidentiary hearing is permissible because he has not "failed to develop the factual basis" of his prosecutorial misconduct claim because he requested a remand for an evidentiary hearing to the Court of Appeals and Michigan Supreme Court.  (Doc. 1-1, Ex. V).   Because Petitioner has not "failed to develop the factual basis" of his prosecutorial misconduct claim, the heightened requirement for an evidentiary hearing under 28 U.S.C. § 2254(e)(2) does not apply, and the court may grant an evidentiary hearing if certain more lenient conditions are met.  *Williams v. Taylor*, 529 U.S. 420, 433 (2000).  Specifically, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Moreover, "bald assertions and conclusory  allegations do not provide sufficient ground to warrant requiring

. . . an evidentiary hearing." *Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)).

In this case, Petitioner relies on alleged inconsistencies in Hodges' testimony and perjured testimony given in another trial which took place months after Petitioner's trial to support his claim that the prosecution knowingly used false evidence in his case. These factual allegations, even if true, fail to support a prosecutorial misconduct claim as they do not demonstrate that the prosecution knowingly used false evidence in Petitioner's trial. Accordingly, Petitioner is not entitled to an evidentiary hearing on his prosecutorial misconduct claim.

## E.    Allegedly Exculpatory DNA Evidence

Petitioner also argues his due process rights were violated because the state failed to properly preserve the used condom. Evidence technician Veneta Friend testified that she located a used condom at the crime scene, took necessary crime scene photographs, and collected the condom for transportation to the police station for storage. (Doc. 8-15 at PgID 2321). She wore gloves when she picked up the condom with tongs and placed it in a collection bag which she sealed and then delivered to the Michigan State Police Lab. (Doc. 8-16 at PgID 2382, 2386-87, 2389). Friend

testified that after reporting to the Wilson residence where the rape took place, she finished her investigation at about 3:00 or 4:00 a.m. and then returned to her home and then reported to the police station the next morning at 8:00 a.m.  (Doc. 8-15 at PgID 2325).

The film of the condom depicting its placement on the bed was later destroyed when a car ran over the film.  *Id.* at PgID 2325-26.  However, Friend testified to the condom's placement on the bed based on her memory.  *Id.* at PgID 2321.  Officer Donald Gracey also testified about finding the condom on the bed.  (Doc. 8-10 at PgID 1138).  Petitioner argues that Friend violated evidence collection protocol by not returning to the police station with the condom at 3:00 or 4:00 a.m. rather than four or five hours later at 8:00 a.m.  Petitioner also contends that Friend left the condom in her car overnight.

There is a constitutionally guaranteed access to evidence.  *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001).  There are two tests to determine whether the government's failure to preserve evidence constitutes a due process violation: (1) where the evidence is "materially exculpatory," and (2) where the evidence is "potentially useful."  *Id.*  Where the government fails to preserve "materially exculpatory" evidence, a due

process violation exists regardless of whether the government acted in bad faith. *Id.* at 571. On the other hand, where the lost evidence is only "potentially useful," a due process violation only exists where the defendant can show that (1) the government acted in bad faith in failing to preserve the evidence, (2) the exculpatory value of the evidence was apparent before its destruction; and (3) the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other means. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Wright*, 260 F.3d at 571. A finding of bad faith is particularly important. *Youngblood*, 488 U.S. at 58. A determination of bad faith turns upon the government's knowledge of the evidence's exculpatory value at the time it was lost or destroyed. *Youngblood,* 488 U.S. at 56-57n.*; *Wright*, 260 F.3d at 571. Negligence, even gross negligence, in failing to preserve exculpatory evidence is insufficient to establish bad faith. *Wright*, 260 F.3d at 571.

The court first considers the loss of the photo depicting the used condom on the bed. This evidence is only "potentially useful." Petitioner has failed to show that the government acted in bad faith when the film was lost, only that the government acted negligently. Also, no exculpatory value of the photographic film would have been apparent at the time.

Accordingly, there is no due process violation arising out of the lost photographic film depicting the condom on the bed.

The court turns now to the used condom. First, the question is did the prosecution fail to preserve the condom. The condom was not lost. In fact, it was taken into evidence, analyzed by both Jackson and Helton, and the victim and Petitioner's DNA were detected on the inside and outside of the condom. Helton also reported that the DNA of one unidentified person who could have been male or female was on the condom. (Doc. 8-16 at PgId 2473, 2487-93, Doc. 8-17 at pgID 2505-06, 2511, 2513). She explained that the third person's DNA was found on the condom but was too insufficient to be positively identified. ( Doc. 8-16 at PgId 2488, Doc. 8-17 at PgId 2505-06). Jackson testified the sperm sample taken after the assault was consistent with sexual intercourse taking place less than 12-hours before the sample was taken (Doc. 8-16 at PgID 2413, 2433), and Helton testified that it could be up to 12-hours, possibly up to 18-hours, but definitely no longer than 18-hours. (Doc. 8-16 at PgID 2475-76, Doc. 8-17 at PgId 2514-15). Helton's testimony that there was a third-donor's DNA on the condom was potentially exculpatory as Petitioner argued to the jury that he was not the rapist, but some third person whose DNA was detected

on the condom.

Petitioner argues that if the condom was taken directly to the police station, DNA analysis might have revealed the identify of the third person whose DNA forensic scientist Helton stated was on the condom. The question then becomes, if the condom, which had been placed in a sealed evidentiary bag at the crime scene, been returned to the police station a few hours sooner would DNA Analyst Helton have been able to positively identify the third donor. And assuming that she could, would this have been more exculpatory to Petitioner than her report of the existence of a third donor. It is unclear why the return of the sealed evidence bag to the police station a few hours earlier would have helped Petitioner's defense. But even assuming that degradation took place as true, this does not amount to a due process violation here because there was not a failure to preserve materially exculpatory evidence. The evidence was sufficiently preserved for Petitioner to argue that a third person was the rapist. The fact that the third person's identity was not made known did not preclude the potential exculpatory nature of the condom as it was preserved and presented for analysis. The potentially exculpatory nature of the condom was available to Petitioner whose counsel thoroughly cross-examined the

DNA analyst about the presence of a third donor, the fact that the third donor's DNA was present but had degraded, and who effectively used that testimony during his closing argument to accuse a third-party of the rape.

Also, it is the DNA samples from the victim's vaginal smear taken as part of a sexual assault examination which identified Petitioner's DNA as a match with an accuracy rate of one in 16.2 quadrillion. (Doc. 8-16 at pgID 2471-72). Petitioner and the victim's DNA only were on the vaginal swab taken from the rape kit. (Doc. 8-16 at PgID 2491, Doc. 8-17 at PgID 2507, 2512). Finally, because it is the DNA from the victim's vaginal smear which would be most incriminating or exculpatory, it is not clear that the existence of the condom and the possibility that it could be tested for DNA evidence would have been apparent to the investigators at the crime scene.

## F.    Actual Innocence

Finally, the court considers Petitioner's argument that he is actually innocent. The Sixth Circuit  has not recognized a free-standing actual innocence claim. *D'Ambrosio v. Bagley*, 527 F.3d 489, 498 n.6 (6th Cir. 2008). Claims of actual innocence based on newly discovered evidence do not state a ground for federal habeas relief unless there is an independent constitutional violation occurring in the underlying state proceeding.

*Herrera v. Collins*, 506 U.S. 390, 400 (1993); *Davis v. Burt*, 100 F. App'x 340, 349-50 (6th Cir. 2004). Petitioner has not shown any constitutional violation occurring in the underlying state court proceeding; thus, there is no basis to his claim of actual innocence. Even if the court were to consider his claim of actual innocence, the court finds the record does not support such a claim. In order to show actual innocence, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *See Schlup v. Delo*, 513 U.S. 298, 327 (1995). To be credible, such a claim requires the petitioner to support his allegations of constitutional error with new and reliable evidence that was not presented at trial. *Schlup*, 513 U.S. at 324.

Petitioner reasserts claims previously considered and rejected. For example, he claims the following allegedly new evidence is exculpatory: (1) an audiorecording between the rape victim and her ex-boyfriend (2), testimony of Cooper and Jackson who were not called at trial, (3) the photoarray shown to Jackson in which he stated he might have seen the rape victim before but was not sure, and (4) evidence that Hodges allegedly gave false testimony. Neither the audiorecording or testimony of Cooper and Jackson could be considered new evidence. Trial counsel

questioned Snell about the audiorecording during cross-examination.

Likewise, Petitioner's argument that the testimony of Jackson or Cooper is newly discovered evidence does not ring true. Their proffered testimony was known at the time of trial and trial counsel, with the agreement of Petitioner, agreed not to present their testimony as it lacked indicia of credibility. Trial counsel also had grave concerns about calling Jackson as there was a concern that Petitioner was trying to "create" his testimony from jail. Also, the photo array involving Jackson's equivocal identification of the rape victim who he said he could not be sure was the woman he saw with the Petitioner at the night club does not make it more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt.

Finally, there is no evidence that Hodges testified falsely in the proceedings below, only that there were alleged inconsistencies between his pretrial statements and trial testimony, inconsistencies which were explored on cross-examination. Proof that Hodges lied in another proceeding months after Petitioner's trial does not demonstrate that Hodges perjured himself at Petitioner's trial.

Even if Petitioner has shown the existence of new evidence, it is

insufficient to overcome the strong evidence of Petitioner's guilt based on the DNA evidence taken from the rape victim's vagina shortly after the sexual attack which matched his DNA with an accuracy of 1 in 16.2 quadrillion, and which two DNA analysts testified the sperm were most likely deposited in the victim within 12-hours of the collection of the rape kit, and one of whom said no more than 18-hours.  Petitioner's DNA also matched the DNA found on both the inside and the outside of the used condom.  There was physical evidence that a rape took place based on bleeding and vaginal bruising which was consistent with a sexual attack. The rape victim testified that she did not know the Petitioner and had never had consensual sex with him.

Just hours after the sexual assault, when Snell was taken to the sexual assault shelter, she told the nurse examining her that she had not had any consensual sex within the prior 96-hours.  Hodges testified that he had seen Petitioner with the co-defendants on six occasions, that Petitioner was present at a meeting the night before the rape when Petitioner and his co-defendants agreed to hunt for rival gang members to take revenge for the abduction of co-defendant Bard's brother, and Petitioner was present with co-defendant Bard the morning after the sexual attack and home

invasion. For these reasons, and based on the strong scientific DNA evidence and corroborating evidence, Petitioner has not demonstrated that he is actually innocent, or that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.

## G.     Petitioner's Motion for Production of Documents (Doc. 6)

Petitioner has also filed a motion for production of documents and for Respondent to answer interrogatories. Specifically, Petitioner requests, among other things, recorded notes of police officers, trial transcripts from the *Butler* case and all discovery materials from that case, records relating to Friend's investigation, and training records. Petitioner also seeks that Officers Doug Macquariie, and ATF Agent Terry Schimke, and Officer Friend answer interrogatories. Petitioner has not shown that he is entitled to discovery. Unlike typical civil litigants, "[h]abeas petitioners have no right to automatic discovery." *Johnson v. Mitchell*, 585 F.3d 923, 934 (6th Cir. 2009) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)). Rule 6(a) permits district courts to authorize discovery in a habeas corpus proceeding under the Federal Rules of Civil Procedure only "for good cause." R. Governing 2254 Cases in the U.S. Dist. Cts. 6(a). "Rule 6 embodies the principle that a court must provide discovery in a habeas

proceeding only 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quoting *Bracy v. Gramley*, 520 U.S. 899, 909-09 (1997)). Having failed to show good cause for the discovery sought, Petitioner's motion for discovery shall be denied.

## H. Petitioner's Motion for Oral Argument (Doc. 13)

The court also considers Petitioner's motion for oral argument which was filed by counsel. (Doc. 13). Although courts do not typically grant oral argument when a party is in custody, a court has discretion to do so. *See* E.D. Mich. L.R. 7.1(f)(1). Having carefully reviewed the written submissions filed by both sides, including those filed by Petitioner pro se, and his reply brief filed through counsel, the court deems these written submissions to be a sufficient basis upon which to rule, and the court declines Petitioner's request for oral argument.

**I.    Petitioner's Request to File a Compact Disc in the Traditional Manner.**

Petitioner filed with his original petition an audiotape recording on compact disc between Snell and Leatrice Williams, which he sought to introduce in support of several of his claims.  *See* Petitioner's Appendix C. Doc. 1-1, Page ID 160-161.

Effective June 1, 2004, the official record of filed cases within the United States District Court for the Eastern District of Michigan was maintained electronically.  As of this date, attorneys were permitted to file pleadings and other documents in all cases by electronic means. *See* E.D. Mich. LR 5.1.1.  As of October 1, 2005, LR 5.1.1 was amended to require electronic filing of all court papers after November 30, 2005.  The Rule permits the Court to "excuse a party from electronic filing on motion for good cause shown." LR 5.1.1(a).

In order to demonstrate good cause within the meaning of LR 5.1.1(a), "a litigant must set forth reasons beyond the resistance to modernization, reluctance to invest in new equipment, or an aversion to technology" to qualify for an exception to electronic filing. *Smith v. Port Hope School Dist.*, 407 F. Supp. 2d 865, 868 (E.D. Mich. 2006).  Instead, "there must be evidence that unusual, unanticipated, or extraordinary

circumstances beyond the control of counsel" that would justify relieving a litigant from the electronic filing requirement. *Id.* At least one judge in this district has permitted compact discs to be filed with the court in a traditional manner. *See Hawthorne-Burdine v. Oakland Univ.*, 158 F. Supp. 3d 586, 592, n. 8 (E.D. Mich. 2016). Having shown cause to file the compact disc in the traditional manner, the court shall direct the Clerk to do so.

## IV. Conclusion

For the reasons set forth above, Petitioner's habeas petition (Doc. 1) is DENIED. A certificate of appealability shall not issue. The court declines to issue a certificate of appealability, because Petitioner has not "made a substantial showing of the denial of a constitutional right," for the reasons stated above. *See* 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22.

IT IS FURTHER ORDERED that Petitioner's motion for production of documents and for Respondent to answer interrogatories (Doc. 6) is DENIED.

IT IS FURTHER ORDERED that Petitioner's motion for oral argument (Doc. 13) is DENIED.

IT IS FURTHER ORDERED that Petitioner's motion to file the compact disk in the traditional manner is GRANTED and the Clerk is ordered to do so.

**IT IS SO ORDERED**.

Dated:  September 27, 2018

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 27, 2018, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk